# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | |
|---|---|
| **BERNADETTE REYES PICKETT,** | Case No. 3:18 CV 1046 |
| Plaintiff, | Judge Jack Zouhary |
| v. | Magistrate Judge James R. Knepp II |
| **COMMISSIONER OF SOCIAL SECURITY,** | |
| Defendant. | **REPORT AND RECOMMENDATION** |

### INTRODUCTION

Plaintiff Bernadette Reyes Pickett ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for preparation of a report and recommendation pursuant to Local Rule 72.2. (Non-document entry dated May 7, 2018). Following review, and for the reasons stated below, the undersigned recommends the decision of the Commissioner be remanded pursuant to Sentence Six of 42 U.S.C. § 405(g) for consideration of new and material evidence.

### PROCEDURAL BACKGROUND

Plaintiff filed for DIB in February 2015, alleging a disability onset date of November 25, 2013. (Tr. 455-56). Her claims were denied initially and upon reconsideration. (Tr. 310-13, 317-19). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 324). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the

ALJ on December 2, 2016. (Tr. 121-72).[1] On May 24, 2017, the ALJ found Plaintiff not disabled in a written decision. (Tr. 19-43). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6); *see* 20 C.F.R. §§ 404.955, 404.981. Plaintiff timely filed the instant action on May 7, 2018. (Doc. 1).

**FACTUAL BACKGROUND**

Personal Background and Testimony

Born in 1970, Plaintiff was 46 years old at the time of the ALJ hearing. *See* Tr. 128, 455.

Plaintiff testified in December 2016 to difficulty driving due to leg numbness and right wrist pain. (Tr. 128). She had a car accident several months prior due to the leg numbness. *Id.*

Plaintiff lived in a two-story house with her father, two daughters, and two granddaughters. (Tr. 132-33). She no longer went upstairs because it was "too dangerous"; she had "tried and it[] [was] very painful and coming down, it [took her] forever." (Tr. 132-33).

Plaintiff previously had injections in her lower back, which helped "[a] little bit", but her pain had flared up due to "a couple" of falls. (Tr. 134). She testified these falls were due to an ear infection that caused Bell's Palsy. (Tr. 134-35). Plaintiff's back pain traveled from her neck into her left shoulder and arm, as well as into her right leg. (Tr. 135). Plaintiff's right knee also sometimes "lock[ed] up" and caused her to fall. (Tr. 136).

Plaintiff also had difficulty with her right wrist. (Tr. 136-37). She had a hard time holding things, opening packages, buttoning, and zipping. *Id.* Her physician told her she needed a total wrist replacement. *Id.* She also had left shoulder problems for approximately six months; she had pain reaching overhead and to the front, but could reach to the side. (Tr. 144). Plaintiff's right

---

1. The ALJ held a prior hearing on September 8, 2016, but due to a significant amount of evidence outstanding, the ALJ postponed the hearing to December. *See* Tr. 253-67.

shoulder was better, but after reaching, "it just starts to kill my neck and my mid-back". (Tr. 144-45). She could move her head side to side, but had pain looking up and down. (Tr. 145). Plaintiff estimated she could look down for about five minutes. *Id.*

Plaintiff also testified to health problems related to diabetes, COPD, asthma, and mental health issues. (Tr. 137-41, 146-47). She had Bell's Palsy, but said physicians did not know whether it was temporary or permanent. (Tr. 141). She testified she was "starting to lose sight out of [her] left eye" and "[e]verything [was] blurry on [that] side." *Id.* She had not been to the eye doctor. (Tr. 141) ("I had just left before this happened, so I don't know if my insurance is going to cover it again."). The Bell's Palsy caused problems with the left side of her face. *Id.* ("I tear a lot, I drool, I can't eat right. I make a mess. . . . I can't smile. I scare people. I talk funny."). Plaintiff also testified that she had been "flagged for lupus", but did not know if she had been diagnosed, and that rheumatoid arthritis was ruled out. (Tr. 142). She was under the care of a rheumatologist. *Id.*

During the day, one of Plaintiff's daughters, and one four-year-old granddaughter were at home with her. (Tr. 147). She played and watched television with her granddaughter. (Tr. 147-48). She did "very little" household chores; she could do dishes (taking breaks to sit in a chair to rest), fold clothing, and prepare simple meals, but could not mop or sweep or vacuum. (Tr. 148). She only grocery shopped with someone else, and had not been to the store alone in about a year. *Id.* She "use[d] the cart" because it was difficult to walk. (Tr. 149).

Plaintiff estimated she could lift about ten pounds, stand about fifteen minutes, and sit for an hour. (Tr. 151).

Relevant Medical Evidence[2]

Prior to her alleged onset date, in July 2013, Plaintiff underwent an enhanced brain CT scan due to right-sided facial numbness. (Tr. 1098). It was negative. *Id.*

In September 2013, Plaintiff slipped and fell on a wet floor at work and reported pain in her right wrist, knee, and low back. *See* Tr. 608, 621, 775. Right wrist x-rays were normal. (Tr. 761). A lumbar spine MRI the following month revealed a left paracentral disc bulge/protrusion with impingement of the left nerve root, degenerative disc changes, disc desiccation at L4-L5 and L5-S1, and "[v]ery mild" narrowing of the central canal at L4-L5 and "minimal" at L3-L4. (Tr. 740-41). Another provider later indicated the MRI showed "a ruptured disc with impingement at the T11-T12 level." (Tr. 624). A right wrist x-ray in December 2013 revealed "[m]ild degenerative change without acute ossific abnormality identified." (Tr. 634).

Also in December 2013, Plaintiff underwent a medical examination with Douglas Gula, D.O., related to her worker's compensation claim. (Tr. 621-27). Dr. Gula noted Plaintiff had tenderness and some reduced range of motion in her lumbar spine, but had a non-antalgic gait, was able to toe and heel walk, and was able to sit and stand without difficulty. (Tr. 623). She also had full motor strength in her lower extremities. *Id.* Dr. Gula stated Plaintiff could return to work without restriction. (Tr. 627).

Plaintiff went to the emergency room twice in early 2014 for lower back pain. (Tr. 603-06, 729-32, 842-46). In January, an examination revealed back tenderness, but a normal range of motion, and no pain with straight leg raise. (Tr. 731). In March, examination again revealed back

---

2. Plaintiff only challenges the ALJ's evaluation of her physical, not her mental impairments. Therefore, the undersigned only summarizes those records relevant to her arguments. *Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) (issues not raised in opening brief waived).

tenderness. (Tr. 844). Plaintiff had a normal neurological examination at both visits. (Tr. 731, 845) When Plaintiff saw with Timothy Haupricht, C.N.P., in April 2014, she had no tenderness, mostly normal motor strength and sensation, and a right straight leg raise was negative "but cause[d] guarding and facial grimace due to right lumbar pain. (Tr. 840).

In the following months, Plaintiff underwent physical therapy. *See generally* Tr. 1822-80. In July, Leo Clark, M.D., reviewed Plaintiff's records and noted that he found "no objective neurological deficits and therefore [did] not urge surgical intervention." (Tr. 643). His examination revealed normal motor, sensory, and reflex findings. (Tr. 642).

In August 2014, Plaintiff saw Merris Young, M.D. (Tr. 805-06). Plaintiff "ambulated with a waddle", but did not limp and was able to walk on her heels and toes "without difficulty". (Tr. 805). Plaintiff had no tenderness, but had some guarding, and positive straight leg raising. *Id.*

Plaintiff went to the emergency room for low back pain in October 2014. (Tr. 1113-16). She had lower back tenderness, but was ambulatory with a steady gait and had an otherwise normal examination. (Tr. 1114-15). Plaintiff returned in November 2014 with nausea and back pain/spasms; she was prescribed medication. *See* Tr. 1112.

Also in November 2014, Plaintiff began pain management treatment with Elizabeth Fowler, M.D. (Tr. 974). Plaintiff reported wrist pain that was "not a major problem", along with mid and lower thoracic pain. *Id.* On examination, Dr. Fowler found spinal tenderness and muscle spasms, a positive straight leg test, and positive Patrick's test on the right. (Tr. 977). She was able to walk heel-to-toe, stand on her heels and toes, and had full strength. *Id.* Dr. Fowler noted Plaintiff had clinical evidence of myofascial pain with right sacroiliitis, and possible right radicular pain. *Id.* She also noted Plaintiff had a displaced lumbar disc at T11-12 which might be contributing to her pain, "although she has no radicular symptoms." *Id.*

5

At an examination related to her worker's compensation claim in December 2014, Nathan Fogt, D.O., observed tenderness and reduced range of motion in Plaintiff's spine. (Tr. 785).

Throughout 2013 and 2014, Plaintiff also treated with her primary care physician Roberta Guibord, D.O., for diabetes, hyperlipidemia, osteoarthritis, sleep apnea, and incontinence problems. *See* Tr. 667-727.

In February 2015, Plaintiff returned to Mr. Haupricht, who found Plaintiff had reduced lumbar range of motion, but full strength and intact sensation in her lower extremities. (Tr. 1207)

From July 2015 through June 2016, Plaintiff continued to see Dr. Guibord for diabetes, rheumatoid arthritis, obesity, degenerative disc disease, joint pain, and mental health issues. *See* Tr. 1310-49. Plaintiff reported various joint and muscular pains. *See id.* Dr. Guibord sometimes observed tenderness on examination in Plaintiff's neck, spine, and wrist. *See id.*

From August to October 2015, Plaintiff underwent physical therapy for her back pain. (Tr. 1457-1544). Plaintiff also presented to the emergency room four times between September and November 2015 for complaints of sinusitis, bacterial conjunctivitis, and probable scabies, cough, a fall, and chronic pain. (Tr. 1700-03, 1556-62, 1568-72, 1714-19).

From October 2015 through June 2016, Plaintiff treated with rheumatologist Vivek Nagaraja, M.D. *See* Tr. 1387-1405. At her first appointment, Plaintiff reported muscle and joint pain, weakness, fatigue, and cold extremities, as well as feeling "foggy throughout the day". (Tr. 1404). X-rays taken in October 2015 showed radionuclide navicular changes in Plaintiff's wrist. (Tr. 1724). On examination, Dr. Nagaraja consistently noted tenderness in Plaintiff's upper and lower extremities, some decreased range of motion, and a normal gait. *See* Tr. 1390, 1395, 1399-1400, 1404. During this time, Dr. Nagaraja assessed fatigue, hair loss, multiple joint pain, wrist

pain, sleep apnea, osteoarthritis, lumbar radiculopathy, obesity, and fibromyalgia. *See* Tr. 1391, 1395-96, 1401, 1405.

In November 2015, Plaintiff reported "all over body pain" to Dr. Guibord. (Tr. 1325). On examination, Dr. Guibord noted tenderness, decreased neck range of motion, and, rib, hip, and back pain. (Tr. 1327). A December 2015 lumbar spine MRI showed degenerative changes at T11-T12 "without large disc herniation", moderate degenerative changes at L4-5, and degenerative changes at L5-S1 with small central disc protrusion. (Tr. 1726-27).

A right wrist MRI in February 2016 revealed osteoarthritis, degenerative changes, and edema, possibly correlated with neuropathy. (Tr. 1381-82). Later that month, Plaintiff saw Margaret Jain, M.D., who diagnosed right wrist arthritis, and lateral epicondylitis of the right elbow, and administered an injection to Plaintiff's right wrist. (Tr. 1406-08). Follow-up x-rays in April showed no changes. (Tr. 1415).

Plaintiff went to the emergency room in June 2016 with a flare up of right wrist pain; she also reported pain in her shoulder, neck, and upper back. (Tr. 1643). On examination, she had tenderness in her upper back, and right wrist, with some swelling. (Tr. 1645). Her lower extremity range of motion and strength were normal, and her gait was "steady". *Id.* Plaintiff returned to the emergency room the following month with back pain, aggravated after sweeping the floor. (Tr. 1650). She noted this was "consistent with her lupus pain that she always has". *Id.* On examination, Plaintiff had spinal tenderness, but no weakness; her gait was "normal". (Tr. 1652).

In August 2016, Plaintiff told Dr. Guibord she had stool incontinence, and leg and arm numbness. (Tr. 1447). She also reported left arm and right hip pain, and a burning sensation in her lower back. *Id.* Dr. Guibord noted Plaintiff was "ambulating normally". *Id.* She assessed, *inter alia*, rheumatoid arthritis. (Tr. 1448).

7

Also in August, Plaintiff saw pain management physician Hares Akbary, M.D. (Tr. 1916-20). On examination, Plaintiff had full range of motion in her neck with no tenderness, an antalgic gait (but was "able to ambulate without assistance"), lumbar paraspinal muscle tenderness and trigger points, as well as positive lumbar facet loading. (Tr. 1918-19). Dr. Akbary prescribed physical therapy and a TENS unit, and ordered lumbar and cervical spine MRIs. (Tr. 1919).

A September 2016 lumbar spine MRI showed worsening of disc abnormalities and small protraction at T11-12 with extensive degenerative findings and mild focal kyphosis. (Tr. 1923). A cervical spine MRI showed low-grade degenerative disc abnormalities including small focal disc protrusions at C5-6 and C6-7 causing mild mass effect on the ventral cervical cord. (Tr. 1921). Later in September, Dr. Akbary noted a previous bilateral SI joint injection and trigger point injection into bilateral lumbar paraspinals produced 50% pain relief. (Tr. 1929). Plaintiff saw Dr. Nagaraja in September, reporting muscle aches, weakness, joint pain back pain, and swelling. (Tr. 1954). Dr. Nagaraja observed Plaintiff had limited range of motion in her right wrist, lumbar spine, and cervical spine, as well as diffuse myofascial tenderness; her gait was normal. (Tr. 1955). He assessed fibromyalgia. *Id.*

In October 2016, Dr. Akbary noted Plaintiff had an antalgic gait, but was "able to ambulate without assistance". (Tr. 1933). She had full neck range of motion and no tenderness, but tenderness and trigger points in her lumbar paraspinal muscles. (Tr. 1933-34). Later that month, Plaintiff returned to the emergency room with left ear pain, headache, and sore throat. (Tr. 1988). Plaintiff was given antibiotics and discharged. (Tr. 2000). Plaintiff returned to the emergency room later that day with a left-sided facial droop, facial numbness, and slurred speech. (Tr. 2006, 2010, 2014). A brain CT scan was negative. (Tr. 2051). Providers diagnosed Bell's Palsy. (Tr. 2019).

8

Plaintiff returned to Dr. Jain in October 2016. (Tr. 1976-80). On examination, Dr. Jain found tenderness in Plaintiff's right elbow and right wrist and noted Plaintiff had some reduced range of motion in her right wrist, though "[o]verall the wrist motion [was] relatively preserved." (Tr. 1979). Dr. Jain administered an injection, and noted Plaintiff "might possibly be a candidate for a total wrist [replacement]". (Tr. 1980).

In December, Dr. Akbary noted Plaintiff had an antalgic gait, but was able to ambulate without assistance. (Tr. 2118). She had normal neck range of motion with no tenderness, lumbar paraspinal tenderness, trigger points in her lumbar paraspinals, and positive lumbar facet loading. *Id.* Dr. Akbary noted Plaintiff's Bell's palsy continued. (Tr. 2119). That same month, Dr. Akbary performed a thoracic kyphoplasty. (Tr. 2123-24). Plaintiff also underwent a bone biopsy, which revealed no occult metastatic carcinoma. (Tr. 2127-29).

Plaintiff also returned to the emergency room in November and December 2016 for ear pain, cough, and back pain. *See* Tr. 2060-81; 2083-2111. In December, she had muscle spasms aggravated by a cough. (Tr. 2088).

In January 2017, Plaintiff had a brain MRI due to left-sided facial weakness, Bell's Palsy, and blurred vision in her left eye for three months. (Tr. 1982). It revealed findings that "would support the diagnosis of multiple sclerosis" but the interpreting physician recommended "post-contrast imaging would be helpful to evaluate for active demyelination". *Id.* Plaintiff returned to Dr. Akbary, who noted Plaintiff's physical examination was unchanged. (Tr. 2141-42). He ordered a brain MRI with contrast, and referred Plaintiff to Dr. Mahmood "regarding MS". (Tr. 2141).

Plaintiff saw Khalid Mahmood, M.D., the following week. (Tr. 2145-48). Dr. Mahmood noted Plaintiff complained of "numbness in different parts of the body at different times lasting momentarily", and blurry vision in her left eye. (Tr. 2145). On examination, Plaintiff had full range

9

of motion in her back, with no musculoskeletal tenderness or swelling. (Tr. 2147). Dr. Mahmood observed Plaintiff's Bell's Palsy, and noted her gait was normal, but her Romberg test was positive and her reflexes were "0/4 throughout". *Id.* Plaintiff denied back pain. (Tr. 2145). Dr. Mahmood referred Plaintiff for an eye examination to rule out optic neuritis, and ordered numerous laboratory studies, a cervical spine MRI, and a lumbar puncture. (Tr. 2147). The cervical spine MRI showed mild annular disc bulge at C5/6 interspace, and no abnormal enhancement or signal within the cord. (Tr. 2149).

Plaintiff returned to Dr. Mahmood in February 2017. (Tr. 2156-57). Dr. Mahmood noted Plaintiff's cervical spine MRI was negative, her lumbar puncture was unsuccessful, and her Lyme disease test was negative. (Tr. 2155). Plaintiff told Dr. Mahmood that an ophthalmologist stated her eye was affected by MS. (Tr. 2155). Plaintiff again denied back pain (Tr. 2156), and Dr. Mahmood noted similar physical findings on examination (Tr. 2157). He diagnosed "[b]lurry vision, left eye" and his clinical notes stated: "[w]ill review MRI brain with neuroradiologist." (Tr. 2158).

*Opinion Evidence*

In August 2014, Dr. Young opined that Plaintiff was able to work with restrictions: no heavy lifting, and no repetitive bending, twisting, or squatting. (Tr. 806). Providers completed numerous work restriction forms related to Plaintiff's worker's compensation claim. *See* Tr. 931, 937, 940, 943, 946, 949, 952, 955, 958, 961, 964, 967, 970. In December 2014, Dr. Fogt opined Plaintiff had reached "maximum medical improvement" and was capable of performing full duty work. (Tr. 785-86).

In February 2015, State agency physician William Bolz, M.D., reviewed Plaintiff's records and opined she could occasionally lift or carry twenty pounds, and frequently lift or carry ten

10

pounds. (Tr. 273). He opined she could sit, stand, or walk for up to six hours in an eight-hour workday. (Tr. 273-74). She could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl, but never climb ladders, ropes, or scaffolds. (Tr. 274). He opined Plaintiff should avoid even moderate exposure to pulmonary irritants and avoid all exposure to hazards. (Tr. 275).

In May 2015, State agency physician Robert Wysokinski, M.D., reviewed Plaintiff's records and affirmed Dr. Bolz's restrictions, with an added restriction to never crawl. (Tr. 296-98).

In a January 2016 "To Whom It May Concern" letter, Dr. Guibord stated: "Due to medical conditions [Plaintiff] is unable to work at this time." (Tr. 1294).

In October 2016, Plaintiff underwent an occupational therapy evaluation with Lynne Chapman, OT, MS, LICDC. (Tr. 1819-22). Ms. Chapman opined that Plaintiff could lift ten pounds from floor to waist level, but not from waist to eye level. (Tr. 1821). She could carry ten pounds, and push twenty, but not pull. *Id.* Ms. Chapman believed Plaintiff could occasionally sit, stand, perform lowered work, and rotate her trunk while standing. *Id.* Plaintiff was unable to perform elevated work, kneel, squat, reclining reach, climb stairs, repetitive squat, crawl, climb ladders, or rotate her trunk while sitting. *Id.* Ms. Chapman noted Plaintiff required assistance with bathing and toileting. *Id.* She also noted Plaintiff had a recent history of falling while walking, and right upper extremity weakness with limited range of motion. (Tr. 1822). Plaintiff was "participating in physical therapy aquatics and it was recommended that [she] use a single point cane for mobility due to recent fall". *Id.* Ms. Chapman opined Plaintiff could not return to her former employment and would need assistance "securing sedentary duty work with accommodations once [she] completes all of her interventions." *Id.*

In December 2016, Dr. Jain opined Plaintiff could "[f]requently (up to 66 2/3% of the day)" perform fine manipulation with her right arm, and "[o]ccasionally (up to 33 1/3% of the day)"

11

perform gross manipulation. (Tr. 1949). She noted Plaintiff's wrist pain was "moderate", meaning it "could be tolerated but would cause marked hardship in the performance of the activity which precipitates the pain; would restrict ability to maintain concentration." *Id.*

VE Testimony

At the hearing, the ALJ the VE testified that an individual of Plaintiff's age, education, experience and RFC (as determined by the ALJ) could perform work as sorter or packager. (Tr. 154-57).

ALJ Decision

In her May 24, 2017 written decision, the ALJ found Plaintiff met the insured status requirements for DIB through December 31, 2018, and had not engaged in substantial gainful activity since November 25, 2013, her alleged onset date. (Tr. 21). She found Plaintiff had severe impairments of: obesity; cervical, thoracic, and lumbar spine degenerative disc disease; asthma; mild fibromyalgia; osteoarthritis of the right knee; right lateral epicondylitis; osteoarthritis of the right wrist and hand; diabetes mellitus; right bundle branch block/unstable angina; and psychological conditions variously described as a dysthymic disorder, major depression, and bipolar disorder. *Id.* None of these impairments (singly or in combination), met or medically equaled the severity of a listed impairments. (Tr. 23). The ALJ set forth Plaintiff's physical residual functional capacity ("RFC"):

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except in that the claimant can lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently. She can sit for 6 hours of an 8-hour workday and can stand and/or walk for 6 hours out of an 8-hour workday. She must have the ability to alternate between sitting and standing, at her option, every 30 minutes for 1-2 minutes so long as she is not off task or has to leave the vicinity of the workstation. The claimant can never climb ladders, ropes, scaffolds or crawl, and can occasionally climb ramps and stairs, balance, crouch, kneel, and stoop. She can never reach overhead with the non-dominant left upper extremity and can only reach frequently to the front and can only reach overhead with the dominant right

12

upper extremity on an occasional basis. She can frequently use her dominant right upper extremity for handling, pushing and pulling, and operation of hand controls. She can use her left lower extremity on a frequent basis for the operation of foot controls and pushing and pulling, and can do this on an occasional basis with the right lower extremity. She cannot walk on uneven terrain or work around unprotected heights or unprotected moving mechanical machinery. She cannot perform any commercial driving. She can have only occasional exposure to extreme cold, heat, and humidity along with dust, fumes, odors, gases, or other pulmonary irritants.

(Tr. 26).[3]

Based on this RFC, the ALJ found Plaintiff was unable to perform her past relevant work. (Tr. 41). However, considering her age, education, work experience, and RFC, the ALJ concluded there were other jobs that exist in significant numbers in the national economy that Plaintiff could perform. *Id.* Therefore, the ALJ found Plaintiff not disabled. (Tr. 42).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn

---

3. The RFC also contained mental restrictions which are not at issue here. *See* Tr. 26-27.

"so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and

14

meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff seeks a Sentence Six remand, arguing remand is required for the consideration of new and material evidence. (Doc. 13, at 15-18). Alternatively, she contends the ALJ's decision is not supported by substantial evidence because: (1) the ALJ violated the treating physician rule with respect to Drs. Jain and Nagaraja; (2) the ALJ failed to properly evaluate Plaintiff's credibility / subjective symptom statements; and (3) the Commissioner failed to carry her burden at Step Five. *Id.* at 18-24. The Commissioner responds, unsurprisingly, that Plaintiff has failed to establish the need for a Sentence Six remand and there is no error in the ALJ's decision. (Doc. 16). For the reasons discussed below, the undersigned recommends a Sentence Six remand.

Sentence Six

Plaintiff first argues that she is entitled to a "Sentence Six" remand under § 405(g). *See* 42 U.S.C. § 405(g) ("The court . . . may at any time order additional evidence to be taken before the Commissioner . . ., but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . ."). To obtain a remand, thus, the claimant must show that the evidence is "new," "material," and that there was "good cause" for failure to present it at the hearing. *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir. 2010). Evidence is "new" if it was not in existence or available to the claimant at the time of the administrative proceeding. *Sullivan v. Finkelstein,* 496 U.S. 617, 626 (1990). Evidence is "material" if "there was a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988). In order to show

15

"good cause," a claimant must "demonstrat[e] a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster v. Halter,* 279 F.3d 348, 357 (6th Cir. 2001). "The mere fact that evidence was not in existence at the time of the ALJ's decision does not necessarily satisfy the 'good cause' requirement." *Courter v. Commissioner of Social Security*, 479 F. App'x 713, 725 (6th Cir. 2012).

In support of her argument for a Sentence Six remand, Plaintiff points to evidence showing she was diagnosed with multiple sclerosis six days after the ALJ's decision. (Doc. 13, at 17) (citing Tr. 87, 89).[4] In the cited treatment note from May 30, 2017, Dr. Mahmood noted he reviewed Plaintiff's brain MRI with the neurologist and it was "consistent with multiple sclerosis lesions". (Tr. 87). Dr. Mahmood diagnosed multiple sclerosis, and prescribed medication. (Tr. 89).

Contrary to the Commissioner's argument, the undersigned finds the evidence Plaintiff points to is clearly new, in that it was generated after the ALJ's decision, and contained a new, definitive diagnosis not previously in the record. *See Sullivan*, 496 U.S. at 626. For the same reasons, the undersigned finds Plaintiff has "good cause" for her failure to present the evidence earlier. This is because Plaintiff was actively seeking treatment and a diagnosis throughout the relevant time period.[5]

The main substance of the disagreement between the parties goes to materiality. Plaintiff contends the multiple sclerosis diagnosis is material "because the ALJ specifically relied on the lack of an MS diagnosis in denying benefits." (Doc. 13, at 17) (citing Tr. 23); *see also* Doc. 18, at

---

4. Although Plaintiff submitted additional evidence after the ALJ's decision, and cites it generally (*see* Doc. 13, at 25 (citing Tr. 52-120, 173-252); Doc. 18, at 1 (citing same)), she only presents a developed argument about the multiple sclerosis diagnosis. Therefore, the undersigned only addresses whether a Sentence Six remand is appropriate to consider Dr. Mahmood's August 30, 2017 treatment record (Tr. 87-90).

5. The Commissioner presents no argument regarding "good cause". *See* Doc. 16, at 10-12.

3 ("The ALJ explained at length that there was no diagnosis of MS, strongly suggesting that the lack of diagnosis caused her to infer that the presenting symptoms were not severe or disabling."). The Commissioner responds that the evidence is not material because "Plaintiff has not demonstrated that the confirmed MS diagnosis would have caused the ALJ to reach a different conclusion." (Doc. 16, at 11). That is, the Commissioner contends, "[e]ven if the MS diagnosis existed at the time of the ALJ's decision, it is clear it would not have affected the ALJ's ultimate finding, as she reasonably found that the associated signs and symptoms—namely blurry vision and left-sided facial weakness—did not more than minimally affect Plaintiff's ability to perform work activity for twelve months." *Id.*

Although "[t]he mere diagnosis of [an impairment], of course, says nothing about the severity of the condition", *Higgs v. Bowen*, 880 F.3d 860, 863 (6th Cir. 1988), under the factual circumstances here, the undersigned finds the multiple sclerosis diagnosis is material. At Step Two of her analysis, the ALJ explained why she found Plaintiff's Bell's Palsy and associated symptoms non-severe:

> In October 2016, the claimant complained [of] facial droop and slurred speech with a normal CTA of the head (Exhibit 43F 68, 70). In November 2016, the claimant had a non-focal neurological examination (Exhibit 44F 9). The January 2017 records noted complaints of left facial weakness, Bell's palsy, and some blurred vision for 3 months. The January 10, 2017 MRI of the brain failed to reveal any infarct and the impression indicated that a post contrast image would be helpful to evaluate for active demyelination *without a clear diagnosis of multiple sclerosis* (Exhibit 42F 2). The January 16, 2017 MRI of the brain with and without contrast did not show active enhancement with some suspicion for demyelinating plaque of multiple sclerosis. There was also enhancement of the left facial nerves suggesting underlying Bell's palsy or inflammation of the nerve (Exhibit 46F 32). The record does not support these conditions rose to a severe level for 12 months or otherwise cause more than minimal functional limitations. Despite three months of vision complaints, the claimant testified in December 2016 she had not pursued treatment with a vision specialist (Hearing Testimony). Further, Khalid Mahmood's [sic], M.D., treatment notes from February 2017 *did not provide a diagnosis of MS* and only noted left-sided Bell's palsy along with left eye blurry vision (Exhibit 48F).

17

(Tr. 22-23) (emphasis added). Thus, in evaluating these symptoms, the ALJ relied (at least in part) on the lack of multiple sclerosis diagnosis. This suggests that she may have viewed these symptoms (and perhaps others) differently with a definitive diagnosis.

The Sixth Circuit has also explained that "[m]ultiple sclerosis is an incurable, progressive disease subject to [] periods of remission and exacerbation." *Parish v. Califano*, 642 F.2d 188, 193 (6th Cir. 1981). "Nevertheless, in this circuit, multiple sclerosis is not per se disabling under the social security regulations." *Jones v. Sec'y of Health & Human Servs.*, 35 F.3d 566 (6th Cir. 1994) (unpublished table disposition); *Wilcox v. Sullivan*, 917 F.2d 272, 277 (6th Cir. 1990). In evaluating multiple sclerosis, the Sixth Circuit has held that because of the episodic nature of the disease, an ALJ must consider the frequency and duration of exacerbations, the length of the remissions, and the evidence of permanent disabilities in evaluating multiple sclerosis. *Wilcox*, 917 F.2d at 277. The undersigned finds Plaintiff's subsequent definitive multiple sclerosis diagnosis material because it provides, in retrospect, evidence of an underlying impairment that could explain Plaintiff's various symptoms. *See Begley v. Mathews,* 544 F.2d 1345, 1354 (6th Cir.1976) ("Medical evidence of a subsequent condition of health, reasonably proximate to a preceding time, may be used to establish the existence of the same condition at the preceding time"). And, there exists a reasonable probability that the ALJ may have viewed the associated symptoms in a different light given the diagnosis.

Thus, the nature of multiple sclerosis, combined with the ALJ's seeming reliance on the lack of diagnosis, justifies a Sentence Six remand in this case.[6] That is, the undersigned finds Plaintiff has shown "a reasonable probability that the [Commissioner] would have reached a

---

6. Because the undersigned recommends a Sentence Six remand, there is no need to reach Plaintiff's alternative arguments for remand pursuant to Sentence Four.

18

different disposition of the disability claim if presented with the new evidence." *Sizemore*, 865 F.2d at 711.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned recommends the Commissioner's decision be remanded pursuant to Sentence Six of 42 U.S.C. § 405(g) for consideration of new and material evidence.

    s/ James R. Knepp II
    United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).